THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>   v.<br><br>JOHN HOLCOMB,<br><br>        Defendant. | No. CR 21-0075-RSL<br><br>REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO SUPPRESS |

## I.    Introduction

The government admits that the Riquelme warrant gave police the authority to search the entirety of all devices, including all separate hard drives, belonging to Mr. Holcomb but denies that the warrant is a general warrant.[1] Dkt. 41 at 23-24. Additionally, it appears the government now justifies that authority based on the evidence that law enforcement discovered.[2] The government's reasoning to support the

---

[1] When the government states "there would have been no other way for the police to identify and seize responsive evidence" (Dkt. 41 at 24), it ignores search protocols and filters available to law enforcement, as well as Mr. Holcomb's attempts to educate the government on how to search the devices at issue while complying with the Fourth Amendment. Dkt. 35-3 at 9-28; Ex. 1. That the government is unable to derive a method with search and date protocols, even after Mr. Holcomb filed motions to suppress in Washington state and in the instant federal case, suggests suppression would deter a general search in the future.

[2] Setting aside the presumption of innocence, the government's post-temporal analysis offers no assistance because reasonableness is based on information officers had in their possession when the search or seizure occurred. *Saucier v. Katz*, 533 U.S. 194, 206

search of the lower hard drive invites error.[3] The government attempts to create offense specific exceptions to the Fourth Amendment also invites error.[4]

  Mr. Holcomb endeavors to address the government's opposition without waiving any claims he has raised in his opening motion.[5] Because the government defends the search, citing only to the Riquelme warrant, Mr. Holcomb focuses on that warrant and the circumstances surrounding it.[6] The Riquelme warrant, referred to by the government as "the computer" warrant, facially violates the Fourth Amendment or, in the alternative, law enforcement executed the warrant in violation of terms of the warrant.

---

(2001) (Receded from on other grounds in *Pearson v. Callahan*, 555 U.S. 223 (2009)). This was not a child pornography investigation.

[3] *See* Ex. 2 (redactions not in originals).

[4] *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) ("If the warrantless search of a homicide scene is reasonable, why not the warrantless search of the scene of a rape, a robbery, or a burglary? 'No consideration relevant to the Fourth Amendment suggests any point of rational limitation' of such a doctrine.")

[5] The government should have produced the warrant it intended to rely on months ago because it knew the exact contours of Mr. Holcomb's suppression argument, which counsel disclosed on the record at the initial appearance and where the Court entered an order under the Due Process Protection Act (DPPA). Dkt. 12-13, 28.

To suggest that arguments are waived under such circumstances is wrong and unfair. Dkt. 41 at 28, fn. 8. Also "claims," not "arguments" are waived. *United States v. Lillard*, 935 F.3d 827, 833 (9th Cir. 2019) (internal citations omitted); *Yee v. Escondido*, 503 U.S. 519, 534 (1992). It is the government's burden to raise claims and arguments justifying the search. It is not for Mr. Holcomb to speculate which arguments the government might make and reply to hypothetical government positions in his opening motion to suppress.

[6] To the extent they apply, all arguments raised as to the Riquelme warrant apply to the other warrants as well.

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## II.     The government's opposition rests on the Court's interpretation of the Riquelme warrant and the manner in which it was executed – and since it was disclosed recently, additional background and context is necessary.

The recently disclosed Riquelme warrant states that the judge believed that Mr. Holcomb committed Rape in the second degree in violation of RCW 9A.44.050. Dkt. 41-1. The portion of the statute relevant to Mr. Holcomb's case prohibits an individual from engaging in sexual intercourse with another person by forcible compulsion. RCW 9A.44.050(1)(a). However, "once a defendant asserts a consent defense and provides sufficient evidence to support the defense, the State bears the burden of proving lack of consent as part of its proof of the element of forcible compulsion." *State v. W.R.*, 181 Wash.2d 757, 763, 336 P.3d 1134 (2014). "Forcible compulsion means that 'the force exerted was [(1)] directed at overcoming the victim's resistance and [(2)] was more than that which is normally required to achieve penetration.'" *State v. Wright*, 152 Wash.App. 64, 71, 214 P.3d 968 (2009) (quoting *State v. McKnight*, 54 Wash.App. 521, 528, 774 P.2d 532 (1989)). In other words, "[f]orcible compulsion is not the force inherent in any act of sexual touching, but rather is that 'used or threatened to overcome or prevent resistance by the [victim].'" *State v. Ritola*, 63 Wash.App. 252, 254–55, 817 P.2d 1390 (1991) (quoting *McKnight*, 54 Wash.App. at 527, 774 P.2d 532).

On January 28, 2020, Judge Svaren gave police the authority to seize items from Mr. Holcomb's residence. Dkt. 35-1 at 23-24. As to digital devices, the Svaren warrant only allowed officers to seize – not search – the "(s)uspects cell phone" and "(d)esktop computer located in the living room." Dkt. 35-1 at 15-16. On January 28, Mr. Holcomb gave law enforcement permission to search the "Dell laptop (grey) 'XPS'," "Cooler Master Computer Tower," and "Google Smartphone Pixel 2" with the understanding that he could "withdraw or revoke consent at any time" and "limit the scope of the consent." Dkt. 35-1 at 32-34.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    Six days later, on Monday, February 3, 2020, Mr. Holcomb walked into the

2    police department, revoked consent as to all devices, and Det. Kuschnereit was put on

3    notice that "a search warrant will need to be requested to view that data [from Mr.

4    Holcomb's cell phone[7] and Cooler Master computer tower] from this point on." Dkt.

5    35-1 at 42-43. On February 4, 2020, Det. Kuschnereit filed a motion and affidavit for a

6    search warrant of digital devices belonging to Mr. Holcomb. *Id*. at 45-55.

7    Det. Kuschnereit provided an affidavit to Judge Riquelme where JJ described

8    several consensual sexual acts involving Mr. Holcomb and accused Mr. Holcomb of

9    nonconsensual sexual contact. *Id*. at 47-55. JJ is the sole source of evidence, provided

10    to Judge Riquelme, to suggest that Mr. Holcomb violated RCW 9A.44.050. *Id*.

11    Specifically, JJ said Mr. Holcomb "sexually assaulted her by making her 'suck his

12

---

13    [7] As it relates to exceeding the scope of the Riquelme warrant, when Det. Kuschnereit

14    searched Mr. Holcomb's cell phone, he apparently stayed within the time frame that a
     reasonably well trained officer would understand. Specifically, the detective "used the

15    Cellebrite physical analyzer to open the previously downloaded data of HOLCOMB's
     cell phone" and "searched for items of evidentiary value *that were covered under the*

16    *time constraints of [the] search warrant*." Dkt. 35-1 at 58 (emphasis added). The

17    detective "located several evidence items which [he] marked with an "evidence" tag.
     These items included 24 phone calls between HOLCOMB and [JJ] *from 6/1/2019 to*

18    *current*." *Id*. (emphasis added). Additionally, "(t)here was only one text message of
     evidentiary value which was a text from JJ to Holcomb on 1/26/2020 at 1523 hours...."

19    *Id*.

20
     The manner in which the detective executed the warrant of the cell phone – within the

21    time constraints – demonstrates that he knowingly and intentionally violated the terms
     of the search warrant when he executed the warrant for the computer with Det. Neufeld

22    and DPA Platter. The search of the cell phone is not only evidence of what should have

23    been an appropriate interpretation of the Riquelme warrant for time constraints, but also
     evidence that law enforcement exceeded the scope for the computer and need to be

24    deterred from interpreting the same time constraint clause in different ways in the
     future. The detectives and DPA Platter knew there were time constraints for searching

25    the cell phone and computer. They stayed within the bounds and scope for the cell

26    phone but chose to ignore the bounds contained in the Riquelme warrant for the
     computer.

cock,' and he 'stuck his finger in my ass." Dkt. 35-1 at 47. JJ identified a location where the two alleged assaults occurred: "once just after he picked her up while still in the Tri-Cities area and the second time last night at this residence where Holcomb lives." *Id.* Mr. Holcomb and his wife represented that the acts were consensual based on a review of what actually happened on the surveillance video. *Id.* at 53-54.

JJ admitted that she had "consensual" sex with Mr. Holcomb on numerous occasions in the past when they dated about 17 years earlier in 2003. *Id.* at 47. As to the incident in the Tri-Cities area, she described a consensual sexual encounter where she had vaginal and anal sex "for approximately 30 minutes" with Mr. Holcomb, followed by both of them showering together. *Id.* at 48. She, however, described a separate incident in the Tri-Cities area where she had sex with him when she "gave in cause I couldn't fight [Mr. Holcomb's requests to have sex again] anymore," and said to him "fine, whatever." *Id.* at 48.

Subsequently, when they arrived at Mr. Holcomb's residence, JJ described two additional consensual sexual encounters:

> They continued talking until about 2030 hours. JJ was emotional and teary-eyed so HOLCOMB gave her a hug and they began to make out, and had sex again. This sex occurred on HOLCOMB's bed inside of his bedroom which will be referred to as the "master bedroom" for identification purposes. JJ described HOLCOMB'S bedroom as located next to the living room on the right hand side when walking through the living room from the front entrance area. HOLCOMB at this time had been wearing a blue and black checkered pajama bottoms and no shirt. JJ described the sex they had as HOLCOMB placing his erect penis into her vagina and also having a little bit of anal sex as well. JJ said that the sex ended at 2120 hours and she remembers these times specifically because there is a digital clock on a dresser by the bed.

> JJ further described the furniture in HOLCOMB's bedroom as having a dresser with a mirror over it which is off to the right hand side when entering the room, two nightstands one on each side of the bed, a second dresser over by a closet and a cradle located at the foot of the bed. The

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

sheets on the bed were a dark blue or black color and JJ did not know the color of the comforter because she said that HOLCOMB flung it off of the bed when they climbed into it. There were also some unusual curved lamps on the nightstand. At the head of the bed were black cloth restraints that were held in place by Velcro. JJ said that HOLCOMB had asked her if he could tie her up using these restraints and she had agreed to do so.

Dkt. 35-1 at 48-49.

JJ next reported that she never gave consent to have her photos taken during this encounter, but she did agree to shower with Mr. Holcomb afterward. *Id*. at 48. JJ next described a third incident in the bedroom:

A few minutes into doing this, she started feeling the nausea coming back so she tried to pull her head up away from his penis and he kept pushing her head back down "pushing his dick deeper in my mouth." JJ described almost vomiting on HOLCOMB as he did this. JJ also said that HOLCOMB's penis went deep down her throat causing her pain of 7 on a scale of 1-10 with 10 being the most severe pain she's felt in her life. JJ said that she was able to lift her head up enough to tell him that he needed to stop because she was feeling sick and he said something that sounded like "So?" and pushed her back down onto his penis. JJ said that when she tried to pull her head back harder, he pushed harder down on her head. JJ described how as he was doing this he had one hand grabbing her head, and at the same time his other hand reached over and penetrated her anus with one of his fingers.

JJ described HOLCOMB's finger penetrating her anus as causing her great pain of 8 on a scale of 1-10 with 10 being the most severe pain she's felt in her life. JJ told Officers that this "…hurt so bad" and also said that "The more I fought, the more determined he was." JJ said that she kept trying to pull her head up off of his penis and did manage to tell him no that she doesn't want to because she was feeling sick on three separate times. JJ said that due to her pulling away, and also by her verbally telling him several times that it was very clear to him that it was not consensual sex. On the third lift of her head, she was somehow able to move his arms away which must have caught him off guard. She then told him "I'm done" and left the room crying.

*Id*. at 49-50.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

The encounters in the bedroom occurred over a short and specific time. "JJ said that all of this happened really fast, but she estimated there was less than a minute between each time she told him 'no' specifically." Dkt. 35-1 at 50.

On February 4, 2020, Judge Riquelme gave permission to search for evidence of JJ's accusations in the following locations:

and the evidence of said crime is located at
- ❖ A black colored Cooler Master custom desktop computer (serial #  RC902XBKKN11130600424)
- ❖ A silver colored Dell XPS model P54G laptop (serial # 9K1LK32)
- ❖ A black colored Google Pixel 2 Cell phone (IMEI 357537085579688) & the Cellebrite cell phone data previously
  downloaded from this same device on 1/29/2020
All of these devices are currently secured in temporary evidence at the Burlington Police Department, 311 Cedar Street in Burlington.

Dkt. 41-1.  The warrant authorized a search for:

> ➢ Evidence of communications to or from ▮▮▮▮▮▮▮▮ and/or between JOHN HOLCOMB, ▮▮▮ ▮▮▮ or ▮▮▮▮▮▮▮▮ This communication includes but is not limited to voicemails/audio recordings, SMS, MMS, emails, chats, social media posts/online forums, contact lists and call logs from June 1, 2019 to current.
> ➢ Surveillance video or images depicting ▮▮▮▮▮▮▮ or JOHN HOLCOMB and any other surveillance video or images from Jan 26th 2020 to current.
> ➢ Any location data including GPS coordinates from Jan 26th 2020 to current.
> ➢ User search history from the devices to include but not limited to searched words, items, phrases, names, places, or images from Jan 26th 2020 to current.
> ➢ Files artifacts or information including but not limited to, documents, photographs, videos, e-mails, social media posts, chats and internet cache that would show dominion and control for the devices.

*Id.*.

The warrant commanded that the search occur within 10 days. *Id.* On February 20, 2020, six days after the 10-day requirement lapsed, Det. Kuschnereit sent an e-mail to DPA Platter. The e-mail said that a search was conducted on the "sex videos on the computers" and concluded that "(m)any of the details sounds like they match what the victim reported but I'm not sure on whether the sex at the end appeared forcible."

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 7

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

| | |
|---|---|
| **From:** | Adrian Kuschnereit </O=BURLINGTON/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=ADRIANK> |
| **Sent:** | Thursday, February 20, 2020 5:16 PM |
| **To:** | 'Branden Platter'          @co.skagit.wa.us> |
| **Subject:** | RE: Holcomb |

Update:

Duane said he was able to find the sex videos on the computers. According to Duane it looks like they arrive together in a minivan, start having sex at 1956 hours, take a break at some point in between and then stop having sex at 2355 hours when she says "I'm done". There is audio too, but it might not be the best quality I guess. Many of the details sounds like they match what the victim reported but I'm not sure on whether the sex at the end appeared forcible.

Duane is going to be back tomorrow at 0915 hrs if you'd like to meet me at the sheriff's office then to check it out with Duane?

Dkt 35-1 at 66.

On February 21, 2020, seven days after the 10-day requirement lapsed, Det. Kuschnereit, DPA Platter, and Det. Duane Neufeld viewed the videos that proved the sex between JJ and Mr. Holcomb was consensual. Det. Kuschnereit wrote "(a)t no point in the video clips that I saw did I observe HOLCOMB appearing to restrain JJ forcibly." *Id*. at 63.

The videos of the alleged rape were found only in the *upper hard drive*, or a container completely separate from the lower hard drive. The upper hard drive "is where the surveillance videos from the security cameras were located." Dkt. 35-3 at 18. The upper hard drive contained 6,824 videos – dated between June 2019 and January 28, 2020 – separated into three folders based on the location of the surveillance cameras. Of the 6,824 videos, just "758 video files met the search warrant scope…." Dkt. 35-3 at 19. "It was straightforward to interpret the filenames…." *Id*. The file names:

> …included the camera the video was created from and the date and time. For example: 3_2020-01-28_02-56-39.mp4 is the bedroom camera, identified by the "3_" and the video dated January 28, 2020 at 2:56 AM. To make it easier to search the video files the examiner can filter by Filename on "3_2020", filter Extension on "mp4", and sort by Filename ascending. Forensic Explorer lists 309 video files in chronological order, making the search and examination much easier.

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 8

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

*Id*. It was obvious that all the video surveillance related to the Riquelme warrant, and alleged probable cause, was located on the upper hard drive because the videos were sorted by name, date, and location.

Despite multiple reviews of the video by at least two detectives and one prosecutor, all agreeing no crime occurred, law enforcement decided to continue watching sex videos or processing hard drives that had no nexus to the warrant, affidavit, or alleged probable cause for a rape of JJ. "Detective Neufeld was advised to **continue processing** the **other hard drives** as per standard procedures and to continue looking for additional surveillance videos or angles that may be present."

> On 02/21/2020 at 0915 hours I met Detective Duane Neufeld and Prosecutor Branden Platter at the Skagit County Sheriff's Office to preview the video evidence in this case. Detective Neufeld was still processing the computers and imaging some additional hard drives from the desktop but had located several videos of HOLCOMB and ▇▇▇▇ having sex together on the night of this incident. Detective Neufeld played a few of the videos for us. The last video clip is in black and white and ends at 2355 hours when ▇▇▇▇ stops performing fellatio on HOLCOMB. According to ▇▇▇▇ this was when the originally consensual sexual encounter changed as HOLCOMB held her head down to his penis forcibly. In this video clip HOLCOMB can be seen lying on his back on the bed in the master bedroom. ▇▇▇▇ is lying down with her right side against the bed (facing away from the camera) on HOLCOMB's left side. I observed that ▇▇▇▇ does appear to be willingly performing oral sex on HOLCOMB. In the camera you can distinctly see HOLCOMB's left hand reaching over to touch JUSTICE's butt, while his right hand is resting on the upper part of his chest holding a vape device. At no point in the video clips that I saw did I observe HOLCOMB appearing to restrain ▇▇▇▇ forcibly. Detective Neufeld was advised to continue processing the other hard drives as per standard procedures and to continue looking for additional surveillance videos or angles that may be present.

Dkt. 35-1 at 63 (emphasis added).[8] By asking Det. Neufeld to continue processing the *other* hard drives, all three men knew the search would continue on a hard drive or container that did not have any surveillance video related to the alleged JJ rape. Specifically, the lower hard drive is "where Detective Neufeld located alleged child pornography." Dkt. 35-3 at 12.

The lower hard drive could not have contained any evidence related to video surveillance of the alleged rape because all of the files on the lower hard drive were created on or before September 2018. "The most recent user date file on the [lower] hard drive…[was] created 9/4/2018 1:59:17 AM. There are no user data files created after 9/4/2018 1:59:17 AM." *Id*. at 13. There are no folders on the lower hard drive that

---

[8] This report was not prepared until April 3, 2020, or 43 days after the search occurred.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

have names to connect them to video surveillance. The surveillance videos were automatically saved to the upper hard drive, not the lower hard drive. There are no folders on the lower hard drive that stored video surveillance. Combined, there are no folders on the lower hard drive that contain video surveillance within the time frame of the alleged rape.

A search on Forensic Explorer – the same program used by Det. Neufeld – revealed exactly zero files on the lower hard drive within the date range permitted by the warrant. Ex. 1 at 14. Det. Neufeld had Forensics Explorer training and/or possession of the Forensic Explorer training curriculum. The Forensic Explorer training course includes an entire Data Management section with a focus on "filters" and "data and file view internal searching." Ex. 3.

About two hours after searching and reviewing the surveillance video from the upper hard drive, and apparently conducting no additional investigation into the rape allegation, Det. Kuschnereit sent an e-mail concluding that "we just located some additional exculpatory evidence so it sounds like the case will be dismissed."

| From: | Adrian Kuschnereit </O=BURLINGTON/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=ADRIANK> |
|---|---|
| Sent: | Friday, February 21, 2020 11:19 AM |
| To: | 'Collins, Lisa (WSP)'                    @wsp.wa.gov> |
| Subject: | RE: 20-B00607 |

Yes, that does make sense. Actually this is very timely because this morning we just located some additional exculpatory evidence so it sounds like this case will be dismissed. So please stop all testing except for the required testing of the SAK!

If you have any questions feel free to give me a call or email me back. Thank you!

**Detective Adrian Kuschnereit**
Burlington Police Department
311 Cedar St. Suite B
Burlington WA, 98233

Dkt. 35-1 at 70.

The observations and opinions that there was no forcible compulsion corroborate Mr. Holcomb's protestations of innocence that were provided to Judge Riquelme in the affidavit:

> HOLCOMB said that he only knows that he did have sex because JILL had reviewed the video surveillance on his desktop computer which

showed them doing so. HOLCOMB said that JILL told him after watching the video that JJ was pushing him to have sex with him and at one point while having sex, was "riding him."

Dkt. 35-1 at 53-54.

On April 3, 2020, more than a month after the JJ rape case against Mr. Holcomb was dismissed (Dkt. 41-2), the affiant prepared a supplemental narrative. Dkt. 35-1 at 69. In this report, the affiant stated that on February 21, 2020, seven days after the warrant had expired, he received a call that child pornography was found on Mr. Holcomb's computer. *Id*. The government takes the position that this is the moment when evidence related to child pornography, dating back to 2015, is discovered. Dkt. 41 at 6. The government does not identify where, or on which hard drive, the evidence was discovered. No contemporaneous records are provided to understand the circumstances of this discovery. An evidentiary hearing is necessary to establish whether the search occurred after February 21, 2020, and the circumstances surrounding it.[9]

### A. Under the totality of the circumstances, the Riquelme warrant application does not establish that Mr. Holcomb engaged in sexual intercourse by forcible compulsion with JJ.

The government argues that probable cause existed because the Fourth Amendment "does not require police or judges to believe a target's self-serving claims." Dkt. 41 at 12. The "totality of the circumstances" approach is "highly relevant"

---

[9] Mr. Holcomb advises the Court that DPA Platter is a witness in this case. He was present when the surveillance videos were viewed. It is unclear who advised the officers to continue to search the computer. No procedural protocols have been disclosed allowing such a search. The government appears to defend the search citing to DPA Platter's involvement. Mr. Holcomb has further been advised that Det. Kuschnereit no long works with the Burlington Police Department and the circumstances surrounding his departure have not been disclosed despite requests. The government has informed Mr. Holcomb that it does not believe Det. Kuschnereit is continuing a career in law enforcement.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

in determining veracity, reliability, and the basis of knowledge of an accusing witness. *Illinois v. Gates*, 462 U.S. 213, 230 (1983). Probable cause must turn on facts, not conclusions: "(c)onclusions of the affiant unsupported by underlying facts cannot be used to establish probable cause…An affidavit must recite underlying facts so that the issuing judge can draw his or her own reasonable inferences and conclusions: it is these facts that form the central basis of the probable cause determination." *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013). None of the cases cited by the government involves an accusation of sexual assault.[10]

"Law enforcement officers may obviously rely on statements made by the [alleged] victim[] of a [sexual assault] to identify suspects. But such information does not, on its own, support a finding of probable cause if the information is not reasonably trustworthy or reliable." *Stoot v. City of Everett*, 582 F.3d 910, 919 (9th Cir. 2009). Applying this principle, a higher court rejected a finding of probable cause by a lower court when the accuser told inconsistent stories and the officers were unable to corroborate any aspect of the alleged abuse. *Wesley v. Campbell*, 779 F.3d 421, 431-433 (6th Cir. 2015). In contrast, a higher court found probable cause when "[a]side from [the accused's] own protestations of innocence and his claims that the [sexual assault] allegations against him had been fabricated by the alleged victim for reasons of jealously, he has identified no independent reason the police officer might have doubted her credibility." *Johnson v. District of Columbia*, 927 F.3d 539, 547–48 (D.C. Cir. 2019).

---

[10] There was no evidence that Mr. Holcomb visited child pornography websites or was a member of such sites (*United States v. Gourde*, 440 F.3d 1065 (9th Cir. 2006)), used the e-mail systems to receive and distribute such photos (*United States v. Kelley*, 482 F.3d 1047 (9th Cir. 2007)), or discussed his sexual dispositions on social media (*United States v. Flores*, 802 F.3d 1028 (9th Cir. 2015)).

1       There are multiple reasons to doubt JJ's credibility, even affording deference to

2   Judge Riquelme. JJ did not call 911 or the police to report an assault. The accusation

3   was leveled when ***Mr. Holcomb called the police*** after JJ refused to leave his residence.

4   Dkt. 35-1 at 50. JJ accused Mr. Holcomb of sexual assault against the backdrop of

5   admissions that she engaged in similar acts consensually.

6       The assault accusation must be considered in light of Mr. Holcomb and his

7   wife's representations to the officers that the acts were consensual based on a review of

8   the documentary evidence. Mr. Holcomb offered to show this evidence, the surveillance

9   video, to law enforcement. Dkt. 35-1 at 27 (Mr. Holcomb signed a consent to search

10   form and then "wanted to view the surveillance footage from his bedroom with [law

11   enforcement]. [Mr. Holcomb] advised Jill had viewed the recordings of [Mr. Holcomb]

12   and [JJ] having sex and he wanted [law enforcement] to view them because the video

13   would provide his innocence…[Mr. Holcomb] advised Jill told him [JJ] was the one

14   pushing to have sex and [JJ] was seen riding [Mr. Holcomb]. [Mr. Holcomb] continued

15   to insist that [Mr. Holcomb and law enforcement] watch the video….[Mr. Holcomb]

16   advised…that the sex videos started around 7pm on 1/27/20" and "Jill viewed the

17   footage so there should be a little blue check mark next to the videos.").

18       Mr. Holcomb's wife had no self-serving interest to exculpate her husband. She

19   "seemed upset by what occurred." *Id*. at 40. She cooperated with police by showing

20   them text messages between her and Mr. Holcomb. *Id*. at 39. She told the police that

21   she "reviewed the surveillance system, and found video evidence of Holcomb and JJ

22   having sex in their bed in the bedroom." *Id*. at 40. She told law enforcement that Mr.

23   Holcomb and JJ had consensual sex in multiple positions, based on her review of the

24   video surveillance. *Id*.

25       On these facts, probable cause did not exist to search Mr. Holcomb's devices in

26   their entirety, as argued by the government, for evidence related to forcible compulsion

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 13

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

in violation of RCW 9A.44.050(1)(a). This is particularly true because JJ, Mr.

Holcomb, and Jill were specific as to when, where, and how the alleged assault

occurred. The officers, including the deputy prosecuting attorney, corroborated Mr.

Holcomb's version of the events when they viewed videos exculpating him of the

accusation. JJ made a false accusation and everyone knew it. But, at some point after

that discovery, law enforcement continued to search all the devices. The Court,

respectfully, should suppress all the evidence because probable cause was lacking.

**III.    Even if probable cause existed to issue the warrant, the category of the Riquleme warrant, which read "Files artifacts or information including but not limited to, documents, photographs, videos, e-mails, social media posts, chats and internet cache that would show dominion and control of the devices," along with the other categories, are overly broad.**

Against the backdrop of the facts described above, the Riquelme warrant

allowed officers to search for five categories of digital evidence in broad terms. Ever

since the Supreme Court stated that there are "substantial privacy interests…at stake

when digital data is involved," *Riley v. California*, 573 U.S. 373, 375 (2014), courts

have discussed the need to protect that privacy.[11] As explained in Mr. Holcomb's

---

[11] See, e.g., *United States v. Galpin*, 720 F.3d 436, 447 (2nd Cir. 2013) (discussing the need for "heightened sensitivity to the particularity requirement in the context of digital searches" due to the vast amount of information that digital devices contain); *United States v. Comprehensive Drug Testing, Inc*., 621 F.3d 1162, 1176 (9th Cir. 2010) (discussing the "serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant"); *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) (ability of a computer to store "a huge array" of information "makes the particularity requirement that much more important"); *United States v. Carey*, 172 F.3d 1268, 1275 n.7 (10th Cir. 1999) (discussing the court's "belief that the storage capacity of computers requires a special approach" to particularity and the execution of searches of digital media); *Wheeler v. State*, 135 A.3d 282, 307 (Del. 2016) (risk for warrants for digital and electronic devices to become "general warrants" is substantial, which "necessitates heightened vigilance, at the outset, on the part of judicial officers to guard against unjustified invasions of privacy"); *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 77-78,

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 14

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

opening motion to suppress, the Honorable James P. Donohue did so long before *Riley*. Dkt. 35 at 32.

Courts have also recognized the need for ex ante protections when police seize large caches of private digital data, without probable cause or particularity, to prevent them from exploiting this information. *See, e.g., CDT Inc*., 621 F.3d 1162 (9th Cir. 2010) (per curiam) (en banc); *id.* at 1180 (Kozinski, C.J., concurring); *In re Search Warrant*, 71 A.3d 1158 (Vt. 2012); *State v. Mansor*, 421 P.3d 323 (Or. 2018). This Circuit has approved a "seize first, search second" methodology where the government can "demonstrate…factually why such a broad search and seizure authority is reasonable *in the case at hand.*" *United States v. Hill*, 459 F.3d 966, 975 (9th Cir. 2006) (emphasis added.)

There are two conflicting factual reasons provided to justify the search at issue. Law enforcement represents that they conducted the search "to continue processing the other hard drives as per standard procedure and to continue looking for additional surveillance videos or angles that may be present." Dkt. 35-1 at 63. The government has abandoned that justification, focusing on one provision in the warrant – the dominion and control clause. Dkt. 41 at 13-16. That provision purportedly allowed officers to search the computer for "(f)iles artifacts or information including but not limited to, documents, photographs, videos, e-mails, social media posts, chats and internet cache

46 N.E.3d 638 (2015) (due to the large amount of information on computers, officers must be clear about what they are "seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant") (emphasis added and citing *United States v. Walser*, 275 F.3d 981, 986 (10th Cir. 2001); *People v. Herrera*, 2015 CO 60 (2015) (in executing a search warrant for evidence related to a suspected crime involving a particular victim, it violates the Fourth Amendment for law enforcement officers to open a file labeled with the name of a different possible victim even where the suspected crime was the same); see also Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 565 (2005) (explaining that without careful attention to particularity, "today's diminished protections are likely to shrink even more as technology advances").

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

that would show dominion an control of the devices" Dkt. 41-1. The government argues that the provision allowed the search of all devices, in their entirety, to obtain evidence of dominion and control in the event Mr. Holcomb disputed the same at trial.

But because the affidavit is incorporated in the warrant, the Court evaluates that justification looking at "the affidavit and the warrant as a whole." *United States v. SDI Health Inc.*, 568 F.3d 684, 699 (9th Cir. 2009). An affidavit is incorporated when the warrant uses "suitable words" referring to the affidavit. *Id.* Here, the Riquelme warrant incorporated the affidavit: "Detective Adrian Kuschnereit has this day signed an affidavit on oath before the undersigned, Laura M. Riquelma Judge, Skagit County Superior Court, that he believes that a crime has been or is being committed." Dkt. 41-1 at 2; *see United States v. Vesikuru,* 314 F.3d 1116, 1120 (9th Cir.2002) (holding that "[u]pon the sworn complaint made before me there is probable cause to believe that the [given] crime[ ] ... has been committed" are suitable words of reference.)

"[An incorporated] warrant must not only give clear instructions to a search team, it must also give, that is, not overbroad instructions." *SDI Health Inc.*, 568 F.3d at 702. In *SDI*, the Court invalidated five categories of a warrant similar to the one at issue here:

9. Documents relating to non-privileged internal memoranda and E-mail.

10. Documents relating to bank accounts, brokerage accounts, trusts.

11. Checking, savings, and money market account records, including check registers, cancelled checks, monthly statements, wire transfers, and cashier's checks.

12. Documents relating to personnel and payroll records.

24. Rolodexes, address books and calendars.

*Id.* at 704.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    *SDI* explained that these five categories did not attempt to limit the search. *Id.* at

2    704. In fact, as to Category 24, the Court called its characterization "the laziest of

3    gestures in the direction of specificity" because this category "practically begs the

4    search team to find and seize the contact information of every person who ever dealt

5    with SDI." *Id.* at 705. Here, like the provisions in *SDI*, all five categories, including the

6    dominion and control category, begged the search team to find and seize anything and

7    everything. The provisions gave license to the officers to search broadly for (f)iles

8    artifacts or information including but not limited to, documents, photographs, videos,

9    e-mails, social media posts, chats and internet cache." Dkt. 41-1.

10      Because the government cannot distinguish *SDI* or provide precedent to the

11   contrary, it must concede that the warrant gave "authority to look at all the videos on

12   the computer" (Dkt. 41 at 14) and everything else too. "(T)he warrant authorized the

13   police to search the entire computer." *Id.* at 23. Naturally, in defending that authority,

14   the government points to the prospect that Mr. Holcomb would "someday contest

15   dominion and control" as to possession of the computer and the files associated with it.

16   Dkt. 41 at 26. There are multiple fallacies with the government's justification.

17      Law enforcement *actually* searched the lower hard drive for so-called processing

18   purposes, even though it could not contain any item related to the rape allegation

19   because it did not have any file after September 2018. The search of the lower hard

20   drive occurred after exculpatory and exonerating evidence was discovered on the upper

21   hard drive.

22      All the while, the incorporated affidavit and the warrant made clear that

23   dominion and control was not contested: "HOLCOMB encouraged Detectives to watch

24   the video surveillance and even provided Detectives with the passcode for his desktop

25   computer." Dkt. 35-1 at 54. He gave consent to search the computer and later withdrew

26   that consent. He told law enforcement that he wanted his computer searched for the

relevant surveillance video to prove the rape did not occur. Probable cause is measured from the "facts known" to the officers. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). No facts were available to the officers to suggest that Mr. Holcomb would contest dominion and control at some point in the future.[12]

The other categories fail for the same reasons the dominion and control category fails because, although they provide some temporal limitation, they place no restriction as to what may be searched or seized and they are not tied to seeking evidence of a crime. The Court should suppress all the evidence seized.

**IV.    Even if probable cause existed to issue the warrant, the provision of the Riquleme warrant that read "Files artifacts or information including but not limited to, documents, photographs, videos, e-mails, social media posts, chats and internet cache that would show dominion and control of the devices," along with the other provisions, fail because they are not particular.**

The government, in error, states that the recently produced Riquelme warrant did not contain the "including, but not limited to" language. Dkt. 41 at 24. The warrant clearly shows that it does. Dkt. 41-1 at 3.

None of the cases cited by the government save the warrant. In *United States v. Banks*, 556 F.3d 967, 973 (9th Cir. 2009), the Court rejected that the warrant's "lack of a time frame rendered it insufficiently particular…because the record and affidavit do not demonstrate the knowledge on the part of the government that the illegal conduct

---

[12] A view of the procedural history in this case proves that Mr. Holcomb has never contested the computer belonged to him. He has now filed three motions to suppress in three different jurisdictions, each claiming the computer belonged to him. He has even filed motions to either return or destroy his computer. Ex. 4. The government's position that Mr. Holcomb or his attorneys would ever argue the computer belonged to anyone but Mr. Holcomb is not based in reality.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

was limited to any particular time frame."[13] Here, the affidavit demonstrates that the government knew that the accusation was limited to a particular period of approximately five hours on a single night. Indeed, there was some temporal limitation provided with the first four categories of evidence, suggesting that Judge Riquelme placed those limitations for that very reason. Det. Kuschnereit's review of Mr. Holcomb's cell phone, which connected the search to the appropriate time limitation contained in that warrant, adds support to law enforcement's knowledge that the warrant created time restrictions. But Judge Riquelme's temporal limitations were ignored because, as the government admits, the evidence seized from the lower hard drive dated back to "2015." Dkt. 41 at 2.

Contrary to the government's claim, this case does not involve one of the circumstances where the "including, but not limited to" language is permissible because the provision allowed officers to search and seize items related to a specific crime or type of criminal activity. In *United States v. Reeves*, 1999 WL 33614049 *19 (Appellate Brief) (9th Cir. 1999), the objected to provision read: "may include, but is not limited to…other items related to the manufacturing and distribution of controlled substances, in particular, methamphetamine." The Court found the language permissible. *See United States v. Reeves*, 210 F.3d 1041, 1046 (9th Cir. 2000).

In *United States v. Washington*, 797 F.2d 1461, 1472 (9th Cir.1986), the Court found permissible a provision that allowed search and seizure of "records, notes, [and] documents indicating [the defendant's] involvement and control of prostitution activity including but not limited to, photographs, handwritten notes, ledger books," because the warrant "effectively tells the officers to seize only items indicating prostitution activity." Additionally, in *United States v. Shi*, 525 F.3d 709, 731 (9th Cir. 2008), the

---

[13] *United States v. Brobst*, 558 F.3d 982, 993 (9th Cir. 2009), did not address the issue of breadth or particularity.

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

words "including, but not limited to" did not make a warrant insufficiently particular because it authorized a search of only the limited area the defendant inhabited. The five categories in Mr. Holcomb's case did no such thing.

Here, "[b]y failing to describe with any particularity the items to be seized, the warrant is indistinguishable from the general warrants repeatedly held…to be unconstitutional." *United States v. Kow*, 58 F.3d 423, 426 (9th Cir. 1995). And no precedential justification is provided to the Court.

Particularity makes certain that officers executing the warrant are able to identify, from the face of the warrant and any attached or expressly incorporated documents, what it is that they are being asked to search and seize. *United States v. Bridges*, 344 F.3d 1010, 1017 (9th Cir. 2003). A warrant satisfies the particularity requirement if it clearly states with reasonable specificity what has to be seized or, if any such designation is impossible, at least specifies the suspected criminal conduct and limits the evidence sought to items associated with that conduct. *See Kow*, 58 F.3d at 427.

On the one hand, the warrant need not be "elaborately detailed, and the specificity required varies depending on the circumstances of the case and the type of items involved." *United States v. Rude*, 88 F.3d 1538, 1551 (9th Cir. 1996). On the other hand, generic classifications in a search warrant are acceptable "only when a more precise description is not possible." *Kow*, 58 F.3d at 427. In the latter situation, the scope of the seizure can be limited by such objective criteria as (1) suspected criminal conduct and (2) a time frame within which that conduct occurred, both of which were known to the officers. *Id.* However, generic references to violations of a certain criminal statute, without more, are insufficient to make the description of the evidence sought particular. *See United States v. Cardwell*, 680 F.2d 75-77 (9th Cir. 1982)

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL) - 20

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

(finding provision that contained "including but not limited to" language overbroad even when tied to "violations of 26 U.S.C. s 7201.")

Even if the Court finds that JJ's accusations provided probable cause to conduct a search, the suspected criminal conduct – sexual assault by forcible compulsion – was alleged to have occurred over a brief period on a specified date known to the officers. No reasonable effort is made to justify such a broad search under the circumstances in the face of "exculpatory" evidence that directly refuted JJ's accusation.

Like the dominion and control category, the other categories of the Riquelme warrant suffer from the same problems, even though they contained some temporal limitation. Dkt. 41-1 at 3 ("This communication includes but is not limited to…," "…any other surveillance video or images…," "(a)ny location data…," "[u]ser search history from the devices to include but not limited to…."). Here, like *Bridges*, 344 F.3d at 1018, "it is unclear what is [the warrant's] precise scope or what exactly it is that the [officers] are expected to be looking for during the search." This is particularly true because the provisions are not tied to evidence of a sexual assault that allegedly occurred during a limited and known time. The Riquelme warrant fails for lack of particularity.

## V.       Because the Riquelme warrant is a general warrant, the Court respectfully, must invalidate it.

"Suppression helps ensure that law enforcement personnel adhere to constitutional norms[.]" *Comprehensive Drug Testing, Inc.*, 621 F.3d at 1173. The good faith exception to the exclusionary rule does not apply when the warrant is "so facially overbroad as to preclude reasonable reliance by the executing officers." *United States v. Michaelian*, 803 F.2d 1042, 1046 (9th Cir. 1986). The good faith exception does not apply to a warrant and affidavit that plainly fails to show probable cause. *See United States v. Underwood*, 725 F.3d 1076, 1086 (9th Cir. 2013). The good faith exception

forbids a police officer from relying on an error of his own making. *Groh v. Ramirez*, 540 U.S. 551, 564 (2004).

This is an abnormal case where the officers, in effect, conducted a warrantless search. *Cardwell*, 680 F.2d 75-79 (9th Cir.1982) ("In this case even the most specific descriptions…are fairly general."); *United States v. Spilotro*, 800 F.2d 959, 964-965 (9th Cir.1986) (noting that "the government could have narrowed most of the descriptions in the warrant[ ]" and expressly relying on the conclusion that "the descriptions found deficient in *Cardwell* were at least as precise as the descriptions at issue here"); *Kow*, 58 F.3d at 427 ("By failing to describe with any particularity the items to be seized, the warrant is indistinguishable from the general warrants repeatedly held by this court to be unconstitutional."). Here, a prosecuting attorney was one of the executing officers. DPA Platter helped execute the warrant and determined that probable cause for the alleged rape of JJ no longer existed.

Invoking good faith, the government argues it was "objectively reasonable for the police [and a prosecuting attorney] to rely on the validity of the computer search warrant after [Judge Riquelme] issued it." Dkt. 41 at 27. Good faith provides "an exception to the exclusionary rule for a search conducted in good faith reliance upon an objectively reasonable search warrant." *SDI Health Inc.*, 568 F.3d at 706. For the exception to the exclusionary rule to apply, the executing officers – in this case two detectives and a prosecuting attorney – needed to act "in objectively reasonable reliance on the issuing magistrate's finding of probable cause." *United States v. Leon*, 468 U.S. 897, 922 (1984).

The government concedes that the Riquelme warrant "was granted…to search this desktop computer for evidence *related to the rape investigation*." Dkt. 41 at 5 (emphasis added). This concession, alone, requires suppression of the evidence. Once the two detectives and the prosecuting attorney watched the surveillance video, they

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

concluded that JJ was lying and a rape did not occur. Dkt. 41 at 6. In its response, the government again concedes that JJ was lying and a rape did not occur. *Id*. ("However, there was *no evidence* in the video that Holcomb used compulsion or restrained J.J.") (emphasis added). Yet, the government argues that "nothing about how the police executed the warrant justifies a conclusion that [law enforcement] exceeded its scope when the[y] discovered the videos." Dkt. 41 at 9.

Admitting that there was no evidence of the alleged rape, the government argues that law enforcement was permitted to search a completely different hard drive – with zero files on it subsequent to September 2018. But that search was no longer related to the rape investigation. The government argues that this search was permitted – after probable cause disappeared – because the "dominion-and-control evidence had no temporal limitation." *Id*. And the government makes this argument even though it concedes that the "circumstances of the search" aid in the determination of whether a search exceeds the scope of a warrant. *Id*. at 13.

The government concedes it was apparent that no crime was committed but ignores the circumstances of the search in its analysis. There was only one surveillance camera inside the home. All the surveillance video of JJ was located on the upper hard drive. Not one single file on the lower hard drive was from a date after September 2018. The circumstances of the search prove law enforcement exceeded the scope of the warrant. The government contradicts its position that the warrant authorized a search "for evidence related to the rape investigation." *Id*.

The detectives and DPA Platter knew their search was outside the scope of the warrant. Det. Kuschnereit knew the warrant had temporal limitations based on how he searched the cell phone because his search did not stray into dates earlier than June 2019. He stayed within temporal limitations when he searched the cell phone. But when law enforcement continued its search of the computer hard drives, after watching the

video that exonerated Mr. Holcomb, they knew the search was outside the scope. The government's conclusion (that the officers did not exceed the scope of the warrant) does not fit the very facts ((1) that the search of the computer was for evidence related to a rape and (2) that there was no evidence of a rape) it concedes.

Even if the warrant on its face incorporates the affidavit, to rely on the exception "the government must show that the officers who executed the search *actually relied on the affidavit*." *SDI Health Inc.,* 568 F.3d at 706 (emphasis added). The government makes no such attempt. An evidentiary hearing is necessary to resolve the issue.

The warrant's search provisions are "so facially deficient" for lack of particularity and breadth that no executing officer could reasonably presume them to be valid. *See Leon*, 468 U.S. at 922-923 (1984). In failing to provide the officers sufficient time and scope limitations as to the fifth category of evidence, the issuing judge "wholly abandon[ed] his or her judicial role." *Id.* The same is true as to the other provisions because they are not tied to the investigation of a crime or limited in any substantive manner.

This case does not involve a technical violation of the knock-and-announce rule (*Hudson v. Michigan*, 547 U.S. 586, 591 (2006)), a mistaken interpretation of appellate law (*Davis v. United States*, 564 U.S. 229, 236–37 (2011)), or a computer error in a warrant system caused by the negligence of a third party (*Herring v. United States*, 555 U.S. 135, 147–48 (2009)). The officers (1) searched the computer looking at files dating back to 2015 on a completely separate hard drive that did not have any files after September 2018, (2) viewed video and images of Mr. Holcomb and his wife engaged in intimate acts, (3) did so on an expired warrant, and (4) did so after looking at evidence exculpating Mr. Holcomb of the accusations leveled against him by JJ. They held on to the computer even though Mr. Holcomb told them he needed the computer back because it contained sensitive financial records for his upcoming tax filing.

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 24

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    The government erroneously argues that state law has no relevance to the Fourth

2    Amendment analysis. Dkt. 41 at 2.; *United States v. Mota*, 982 F.2d 1384, 1388 (9th

3    Cir. 1993) (district courts can look to state law in assessing the legality of a search or

4    seizure); *United States v. Artis*, 919 F.3d 1123, 1130 (9th Cir. 2019) (looking to state

5    law and procedure to determine whether warrants violated the Fourth Amendment.) No

6    state precedent or procedure is cited where such a search was conducted by state agents.

7    It is reasonable to infer that this case, involving such a serious accusation, was

8    dismissed before the state filed an opposition to Mr. Holcomb's motion to suppress

9    because the search was in direct violation of the Fourth Amendment.

10   The government's good faith argument fails under Washington state law. The

11   government may not rely on a good faith exception to the exclusionary rule because one

12   does not exist in Washington. *State v. Betancourth*, 190 Wash.2d 357, 366 (2018) ("It is

13   well established that article I, section 7 [of the Constitution of the State of Washington]

14   provides greater protection to individual privacy rights than the Fourth Amendment"

15   and "because the paramount concern of our state's exclusionary rule is protecting an

16   individual's right of privacy, we have explicitly declined to adopt a good faith or

17   reasonableness exception to the exclusionary rule under article I, section 7."); *State v.

18   Werner*, 79 Wash.App 872, 883 (1995) ("The United States Supreme Court has adopted

19   a "good faith" exception to the exclusionary rule. The Washington Supreme Court has

20   not.").

21   Also, under Washington law, a search on an expired warrant under the

22   circumstances is allowed if: (1) probable cause existed throughout the search, (2) it

23   does not create unfair prejudice to the defendant, or (3) the officers did not act in bad

24   faith. *State v. Grenning*, 142 Wash. App. 518, 525–35 (2008), aff'd, 169 Wash. 2d 47

25   (2010) (citations omitted, footnotes omitted). The timing requirement under state law is

26   established by rule. "A search warrant…shall command the officer to search, within a

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL) - 25

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

specified period of time not to exceed 10 days, the person, place, or thing named…."
CrR. 2.3(c) (emphasis added). In *United States v. Jennen*, 596 F.3d 594, 600 (2010), the
Court held that a warrant executed six days after it was issued did not violate the rule
because the "facts underlying the magistrate's determination of probable cause" did not
"material[ly] change" and there was no need for police to confer with a judicial officer
to see if "probable cause still exist[ed]."[14]

Here, probable cause did not exist through the search. Probable cause ceased to
exist upon the viewing of the surveillance video. Everyone who watched the video –
DPA Platter, Det. Kuschnereit, Det. Neufeld, and Mr. Holcomb's wife – knew that JJ
lied when she reported that Mr. Holcomb raped her. In fact, law enforcement did not
even bother to re-interview JJ after they watched the video, to get her take or analysis of
what happened, because it was so apparent she lied about being raped.

Rather than return to the judge to ask for permission to keep searching, the
officers continued to search a completely different hard drive that could not have
contained evidence of the rape alleged by JJ. The officers did not continue the search in
connection with any crime at all. Instead, the officers searched a completely different
hard drive for "processing" purposes, going back in time to 2015. An evidentiary
hearing is necessary to address prejudice and the issue of bad faith.

## VI.    Conclusion

The Honorable John C. Coughenour has stated:

Child pornography is an invidious blight on our society and endangers
those who most need our protection. Rarely will there be a set of facts
more tempting to counsel embracing a legal fiction and ensure the ends
justify the means. Collectors and purveyors of child pornography should
and must be pursued and investigated aggressively—and no doubt that is

---

[14] Abrogated on other grounds by *Descamps v. United States*, 570 U.S. 254 (2013), and
*Mathis v. United States*, 136 S. Ct. 2243 (2016), as recognized in *United States v. Slade*,
873 F.3d 712, 713 (9th Cir. 2017).

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

what the law enforcement officers here were doing. But such pursuit must also be within the limits of our Constitution, lest governmental overreach be justified in lockstep with the severity of the alleged offense. And while endorsement of law enforcement's actions here would appear to benefit society—and admittedly it would—the long term viability of our Constitution demands more, and it depends on sometimes wholly unsatisfactory decisions such as this.

*United States v. Pippin*, 2017 WL 1737666 (W.D. Wash. May 2, 2017) *6, reversed on reconsideration in *United States v. Pippin*, 2017 WL 2806805 (W.D. Wash. June 29, 2017).

Mr. Holcomb requests that the Court suppress all evidence including the fruits of evidence at issue in this case.

DATED this 8th day of April 2022.

Respectfully submitted,


s/ *Mohammad Ali Hamoudi*
s/ *Gregory Geist*
Assistant Federal Public Defenders
Attorneys for John Holcomb

REPLY RE MOTION TO SUPPRESS
(*US v. John Holcomb*; CR21-75RSL)  - 27

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**